# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

BRADD LEWIS-JAMES MLASKOCH,
MLASKOCH EXCAVATING, INC., and
DANIELLE JOHNSON MLASKOCH
*f/k/a Danielle Johnson*,

Defendants.

Civil No. 10-2669 (JRT/LIB)

**MEMORANDUM OPINION AND
ORDER GRANTING
PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

---

Friedrich A. P. Siekert, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN  55415, for plaintiff.

Molly R. Hamilton, **MESSERLI & KRAMER P.A.**, 100 South Fifth Street, Suite 1400, Minneapolis, MN  55402, for defendants.

Plaintiff, the United States of America, sued Bradd Louis James Mlaskoch ("Bradd"), Mlaskoch Excavating, Inc. ("MEI"), and Danielle Johnson Mlaskoch ("Danielle") (collectively, "Defendants"), under Sections 309(b) and (d) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(b), (d).  In Count I, the United States' complaint alleges that Defendants violated Sections 301(a) and 404 of the CWA, 33 U.S.C. §§ 1311(a), 1344, by discharging dredged and fill materials into the waters of the United States in Pine County, Minnesota, without authorization from the United States Army Corps of Engineers ("the Corps").  The United States moves for summary judgment with respect to liability for Count I as to all Defendants.  Because no material issue of fact remains regarding Bradd's and Danielle's liability for violation of Section 301(a) and

404, the Court will grant the United States' motion with respect to the Mlaskochs.  The Court will deny the motion with respect to MEI because a material issue of fact remains regarding whether MEI had sufficient involvement with the work resulting in the discharge of dredged or fill materials to impose CWA liability.

## BACKGROUND

### I.    THE PARTIES

The Mlaskochs live in Sturgeon Lake, Minnesota, and operate MEI out of Willow River, Minnesota.   Bradd initially formed MEI, a Minnesota S corporation, as an excavating company that specialized in laying fiber optic.  (Dep. of Bradd Mlaskoch ("Bradd Dep.") 11:6-9, Mar. 29, 2013, Docket No. 42;[1] Dep. of Danielle Mlaskoch ("Danielle Dep.") 15:24-16:3, Mar. 29, 2013, Docket No. 43.)[2]  Bradd is the president of MEI and Danielle is the company's secretary and vice president.  (Danielle Dep. 11:4-11, 15:3-6.)

---

[1] Bradd's deposition appears on the docket as two separate entries.  The first half of Bradd's deposition appears at Docket Number 42 and the second half appears at Docket Number 44.  The entire deposition is consecutively paginated.  Both halves of Bradd's deposition will be referred to in this Order collectively as "Bradd Dep."  Similarly, the first half of Danielle's deposition is filed at Docket Number 43 and the second half at Docket Number 45.  The two halves of the consecutively paginated deposition will be referred to throughout this Order collectively as "Danielle Dep."

[2] There was some confusion in the deposition testimony regarding MEI and its possibly related entities, but that uncertainty does not impact any of the disputed issues in the present motion.  Apparently MEI also does or has done business as Mlaskoch Excavating and Utility.  (Danielle Dep. 15:24-16:9.)  Bradd's father also owned, at some point, a company known as Mlaskoch Utility Construction.  (*Id.* 12:15-19.)

During the relevant time period the Mlaskochs conducted some of their residential and/or rental housing activities under the name Westside Properties. (Bradd Dep. 19:9-21; Danielle Dep. 27:3-9.) Westside Properties is not and has never been an actual corporate entity (Danielle Dep. 30:4-11) and the parties do not dispute that actions taken under the name Westside Properties were controlled by the Mlaskochs.

## II.    THE SITE

On January 13, 2005, Bradd purchased the real property ("the Site") at issue in this matter. (Bradd Dep. 15:16-16:9; Decl. of Friedrich A. P. Siekert, Ex. 3 at 1, Mar. 29, 2013, Docket No. 34.)[3] The Site is a 200-acre parcel located in Pine County, Minnesota, approximately 5.5 miles east of the Willow River exit off of Interstate Highway 35. (Bradd Dep. 16:10-11; Compl. ¶ 29, June 28, 2010, Docket No. 1; Answer ¶ 13, Nov. 12, 2010, Docket No. 6.) The Site is bordered on the north by Waletzko Road, also known as River Road. (Decl. of Timothy J. Smith, Ex. B ("Site Investigation"), 1-5, Mar. 29, 2013, Docket No. 36; Compl., Ex. A.)[4] A map of the Site is shown below, along with the

---

[3] The Declaration of Friedrich Siekert filed at Docket Number 34 contains a single exhibit which is comprised of individual exhibits produced in connection with the depositions of Bradd and Danielle. In this Order, citations to the Seikert Declaration and an accompanying exhibit number refer to the number assigned to the exhibit at the depositions. Page numbers refer to the CMECF pagination. Exhibits 26 through 29 to the depositions were originally filed in error and appear at Docket Number 52. These exhibits will also be referred to using the convention described above.

[4] Exhibit B to the Smith Declaration is the March 2007 Mlaskoch Norman Township Site Investigation Report authored by Timothy Smith. (Smith Decl. ¶ 9.) This Site Investigation Report was filed on the Docket in four separate parts as attachments 1 through 4 to the Smith Declaration. This Order will refer to the entirety of Exhibit B as the Site Investigation, with page numbers given as the relevant attachment number followed by the CMECF page number. For

(Footnote continued on next page.)

division of the Site into discrete areas that was done for purposes of the investigation

giving rise to this case.

_____

(Footnote continued.)

example Site Investigation 2-107 refers to CMECF page 107 in part 2 of Exhibit B found at the
second attachment to the Smith Declaration.



FSA 2005 Aerial Photo

Mlaskoch Wetland and Road Impact Sites
Section 11 of Norman Township, Pine County, Minnesota

(Compl., Ex. A.)

Prior to Bradd's ownership, the Site was comprised primarily of a forested wetlands complex, swamps, bogs, and upland areas. (Site Investigation 1-6, 1-7.) The Site contained an abandoned homestead and an overgrown farm access road. (*Id.* 1-6;

Bradd Dep. 36:3-17.)   Bradd purchased the Site with the intent to "[c]lean it up" and "[m]ake it usable" in order to subdivide the Site and sell it.  (Bradd Dep. 25:22-24, 43:14-17, 67:5-23; Danielle Dep. 26:26:23-25.)   This cleanup included, among other things, shoring up the existing north-south road to improve access to the Site, excavating at least two ponds, and removing some trees and heavy brush.  (Bradd Dep. 43:21-44:9, 70:15-71:5; Danielle Dep. 28:23-25.)   Bradd eventually sold the Site to the Kettle River Land Company on January 18, 2006, for approximately $450,000.  (Bradd Dep. 21:5-22:4; Siekert Decl., Ex. 5 at 11; *id.*, Ex. 26 at 2.)

## III.   DEVELOPMENT OF THE SITE

After purchasing the Site, the Mlaskochs began development activities.   The parties do not dispute that the Mlaskochs never applied for or obtained a permit from the Corps for any of the construction or development activities described below.  (Compl. ¶ 48; Answer ¶ 32; Bradd Dep. 99:7-9; Smith Decl. ¶ 18.)[5]

---

[5] Both parties' briefs contain potentially disputed facts about the Mlaskochs' previous violations of state and federal environmental laws.   The parties dispute, for example, the Mlaskochs' knowledge of the present violations, and the Mlaskochs contend that the current action was brought by the United States to exact revenge for previous violations of environmental laws.   None of the issues raised by these possible factual disputes are relevant to the issue of summary judgment on liability because the CWA is a strict liability statute.   *See Sierra Club v. City of Little Rock*, 351 F.3d 840, 843 (8th Cir. 2003).   The United States need not show that individuals acted with knowledge of the CWA's requirements, such as by proving the existence of past violations or attempts to circumvent other environmental laws.   *See United States v. Bailey*, 571 F.3d 791, 805 (8th Cir. 2009) ("Bailey also argues that he did not know that the site was wetland before or during the construction of the road.   Civil liability under the Clean Water Act is strict, and the government was not required to show that Bailey knew that his act of building a road violated the Act.").   Other than passing references to revenge, Defendants have made no specific allegation that the United States acted improperly in any of its investigations or in bringing the present action, nor have Defendants identified any authority for the proposition that an improper motive on the part of the United States could insulate them from liability under the CWA.   Thus, although previous violations may be relevant to the ultimate remedy in this

(Footnote continued on next page.)

**A.      The Road**

During 2005, at the Mlaskochs' direction, someone removed the brush that had overgrown the existing north-south road ("the Road") that runs through the Site, in order to make the Road more serviceable.   (Bradd Dep. 38:4-39:1.)   The Road was then widened in order to bring it into compliance with Pine County specifications for roadways.   (*Id.* 190:10-24; Site Investigation 1-5.)   Using a bulldozer, a trac-hoe, and a dump truck the Mlaskochs added swales or ditches on each side of the Road, and deposited the soil from those ditches onto the center of the Road.   (Bradd Dep. 38:13-39:11, 129:1-130:21, 131:2-7, 149:3-6.)   Additionally, the Mlaskochs brought gravel onto the Site and placed it on the Road.   (*Id.* 36:1-3, 36:13-17, 36:23-25, 39:9-16; Site Investigation 1-5.)

**B.      Ponds**

During 2005, the Mlaskochs also used a bulldozer and trac-hoe to excavate the ponds existing on the Site.   (Bradd Dep. 183:20-184:1.)   The Mlaskochs began by clearing some trees and digging out tree stumps from the ponds and placing those stumps around the edges of the ponds.   (*Id.* 72:23-73:3, 185:5-22.)   A trac-hoe was used to dredge soil from the center of the ponds to make them deeper.   (*Id.* 73:4-8, 186:1-12.)   In Area C on the Site, the Mlaskochs created a new pond, rather than expanding a

_____

(Footnote continued.)

case, they need not be explored for purposes of this motion, where the only issue before the Court is liability.  Accordingly, the Court will not delve into these disputed factual issues at this time.

preexisting one.  (*Id.* 73:11-18, 186:13-19.)  After the ponds had been excavated, the material removed from the ponds was spread and smoothed out around the edges of the ponds.  (*Id.* 186:20-187:10; Smith Decl. ¶ 8.)  In total, the Mlaskochs expanded three ponds and created one new pond.  (Bradd Dep. 72:15-22, 73:11-20.)

### C.      Timing of Development

The parties dispute when the development activities at the Site occurred.  The dispute is relevant to Defendants' argument that the statute of limitations on the United States' claims has run.  In the complaint, the United States alleges that work at the Site – including landclearing, road construction, and pond excavation – began in the summer of 2005 and continued through late 2005.  (Compl. ¶ 42.)  In their answer, Defendants "admit only that roadwork was completed at the Norman Township Site in the Spring of 2005" but "deny the remaining allegations."  (Answer ¶ 26.)

In response to a request for information from the Environmental Protection Agency ("EPA") pursuant to 33 U.S.C. § 1318(a) that asked for a timeline of the activities that occurred at the Site, Defendants stated:

> No known work occurred at the Site until after Mlaskoch purchased the Site in January of 2005.  Some excavating/road work was performed from the months of early summer 2005 until Late 2005 . . . .

(Siekert Decl., Ex. 8 at 15.)  Bradd testified that his reference to "excavating/road work" in this response referred to both the "roadwork and the pond work."  (Bradd Dep. 48:23-49:9.)

But during his deposition Bradd testified that all work at the Site, including the Road development was done in "just early '05," which he described as April and May

(*Id.* 50:14-16, 51:3-12, 52:19-23.)   As support for this timeline, Bradd claims that the work at the Site began shortly after he obtained written approval for the project from Robin Poppe of the Pine County Soil and Water Conservation District.   (*Id.* 50:3-7.)   At his deposition, Bradd produced a document purportedly from Poppe, dated March 5, 2005.   (Siekert Decl., Ex. 12 at 27-28.)   Poppe submitted a declaration stating that the written approval produced by Bradd at his deposition is "not an original but appears to be a photocopy," and that the Pine County Soil and Water Conservation District file on the present lawsuit does not contain any such document.   (Decl. of Robin Poppe ¶ 7, Mar. 29, 2013, Docket No. 39.)   Furthermore, Poppe avers that she did not meet Bradd at any point in 2005, never gave Bradd verbal or written permission to go ahead with projects at the Site, and only heard about the activities on the Site on September 20, 2005.   (*Id.* ¶¶ 8-9.)   Finally, Poppe notes that her last name did not become Poppe until she was married in mid-August 2005, and therefore the document produced by Bradd with the name "LGU Person Contacted: Robin Poppe" is either false or incorrectly dated.   (*Id.* ¶ 10.)

Later in his deposition, when questioned about the veracity of the document in light of the timing of Poppe's name change, Bradd admitted that it was possible he had not received the document until August 15, 2005, and completed the work not in the spring of 2005, but in August 2005.   (Bradd Dep. 238:22-239:15.)   He elaborated that "[i]t took several months of digging out there.  I don't know.  I don't know.  Like I say, we started that summer and I'm not sure when we finished.  It's hard to say."   (*Id.* 241:2-6.)

In opposition to the present motion, the Mlaskochs submitted affidavits stating that the development activities with respect to the ponds on the Site were completed by mid to late May 2005.  (Aff. of Danielle Mlaskoch ("Danielle Aff.") ¶ 7, Apr. 19, 2013, Docket No. 51; Aff. of Bradd Mlaskoch ("Bradd Aff.") ¶ 4, Apr. 19, 2013, Docket No. 50.) They further aver that improvements to the Road began in early October 2005 and were completed later that month.  (Danielle Aff. ¶ 8; Bradd Aff. ¶ 5.)

### D.     MEI's Involvement

During the relevant time period the Mlaskochs conducted, directed, and/or controlled the development activities that occurred at the Site.  (*See, e.g.*, Bradd Dep. 38:4-19, 41:1-13, 201:3-17.)  The parties dispute, however, whether MEI took part in any of the development activities that occurred at the Site.  Minnesota Department of Natural Resources ("DNR") Conservation Officer, Julie Olson, stated that when she spoke with Danielle in November 2005 regarding a Cease and Desist Order that was issued for development activities at the Site, Danielle told her that "she was the person responsible for putting in the road on the subject property and that Mlaskoch Excavating, Inc. was performing the work."  (Decl. of Julie M. Olson ¶ 11, Mar. 29, 2013, Docket No. 40.) Danielle, however, denies telling Olson that MEI was doing work on the Site and avers that "the work was being performed in conjunction with [the] Westside Properties business."  (Danielle Aff. ¶ 9.)  Additionally, the Mlaskochs testified that MEI did not have any involvement with the work that was done on the Site.  (Danielle Dep. 16:10-14; Bradd Dep. 146:17-25.)  Bradd also testified, however, that MEI's dump truck was used to haul gravel out to the Site.  (Bradd Dep. 149:4-6.)

Danielle testified that individuals and/or contractors who performed work on the Site were paid by the Mlaskochs personally or through Westside Properties.  (Danielle Aff. ¶ 9; *see also* Danielle Dep. 16:23-8.)  Bradd testified that he could not remember if payments for work performed at the Site were made by MEI.  (Bradd Dep. 147:1-4.)

## IV.    CHRONOLOGY OF THE INVESTIGATION

In October 2005, Poppe of the Pine County Soil and Water Conservation District notified Olson at the DNR of a potential wetland violation at the Site.  (Olson Decl. ¶¶ 4-5.)  Following the tip, Olson drove to the Site and performed a visual inspection.  (*Id.* ¶ 6.)  Based upon these observations, Olson "determined that a wetland violation had occurred on the property in the form of the discharge of dredged and fill material in wetlands."  (*Id.*)  Olson then notified the Pine County Technical Evaluation Panel ("the TEP") and the Corps of possible unauthorized wetlands activity on the site.   (Site Investigation 1-4.)

On November 1, 2005, Olson returned to the Site.  (Olson Decl. ¶ 7.)  During her two visits to the Site, Olson observed that "the discharge and fill activities looked very recent."  (*Id.* ¶ 8.)  Olson noted that the dirt near the Road and around the ponds was loose and lacked vegetation and appeared to have been "filled and/or worked recently." (*Id.*)  Olson also observed the presence of Class 5-type gravel that had been hauled onto the Site and placed on the Road.  (*Id.*)  The next day the DNR conducted a fly-over and took aerial photographs of the Site.  (*Id.* ¶ 9; Site Investigation 1-5.)

On November 18, 2005, Olson issued a Cease and Desist Order for the Site, requiring Bradd and his agents or contractors "immediately to cease and desist any

activity draining, filling, or excavating the wetland," at the Site.   (Olson Decl. ¶ 10, Ex. CDO.)   On November 18, Olson also spoke with Danielle on the telephone and instructed her that no more work could be done on the Site.   (*Id.* ¶ 11.)   The Cease and Desist Order was sent to the Mlaskochs by letter dated November 21, 2005.   (*Id.* ¶ 10; Siekert Decl., Ex. 14 at 38; Bradd Dep. 120:11-121:1.)

On November 21, 2005, the Corps contacted Bradd by telephone, and he told them to speak with Danielle regarding work at the Site.   (Site Investigation 1-5.)   On November 30, members of the Corps and local Pine County officials met with Danielle at the Site.   (*Id.* 2-1; Poppe Decl. ¶ 23.)   During that visit the officials conducted a basic investigation of the development activities and the wetland characteristics of the Site. (*See* Poppe Decl. ¶ 23; Olson Decl. ¶ 13.)

On May 17, 2006, the Corps, the TEP, and Olson returned to the Site to conduct a more thorough investigation.   (Site Investigation 1-5; Olson Decl. ¶ 15.)   During this Site visit, these investigators identified three or four large potential wetland impact areas and observed water flowing from wetland areas through culverts, swales, ditches, and over logging roads.   (Site Investigation 1-5; Olson Decl. ¶ 15.)   Due to these observations, the Corps determined that a thorough Site investigation was needed, including a delineation of wetland impact sites.   (Site Investigation at 1-5, 1-40.)

The Corps conducted further Site investigations in August 2006 and December 2006, as well as one in September 2011 with the EPA.   (Smith Decl. ¶¶ 5, 12; Site Investigation 1-23.)   The purpose of the Site investigations was to ascertain where wetlands were present on the Site, whether the wetlands connected to navigable waters,

and whether fill or dredged materials had been discharged into those areas.  (Smith Decl. ¶¶ 4, 6.)  As explained more fully below, these determinations are critical to ascertaining whether a violation of the CWA occurred.  Representatives of the EPA, the Corps, and other government officials made numerous visits to the Site between 2007 and 2011 in connection with the enforcement actions described below and the present lawsuit.  (*See, e.g.*, Smith Decl. ¶ 15; Decl. of Benjamin R. Cox, ¶ 5, Mar. 29, 2013, Docket No. 37.)

## V.      ENFORCEMENT ACTIONS

On August 25, 2006, the Minnesota Pollution Control Agency ("MPCA") issued a Notice of Violation to Danielle.  (Site Investigation 1-6; Bradd Dep. 121:4-5; Siekert Decl., Ex. 13 at 29-37.)  The notice alleged violations of the National Pollutant Discharge Elimination System and State Disposal System Permit requirements due to the clearing, grading, and excavating activities at the Site.  (Siekert Decl., Ex. 14 at 29.)

On April 5, 2007, the Corps sent Bradd a letter informing him that the Corps had made a determination that Bradd, or persons under his control "have discharged dredged or fill material into approximately 8 acres of wetlands at several locations and constructed four ponds in wetlands on a 200-acre parcel in Pine County Minnesota." (Siekert Decl., Ex. 15 at 42.)   The letter also informed Bradd that the Corps had "determined that an enforcement action is warranted" and was transferring the matter to the EPA for resolution.  (*Id.*)

The DNR issued two Minnesota Wetland Conservation Action Replacement Orders to the Mlaskochs on February 6, 2008.  (Olson Decl. ¶ 20, Exs. RO#1 and

RO#2.)[6]  The replacement orders required Bradd to pay the Pine County Soil and Water Conservation District $320,211.00, unless he obtained approval for an after-the-fact replacement plan, exemption determination, or no-loss determination from the District. (*Id.*, Exs. RO#1 at 4-5 and RO#2 at 4-5.)

On March 10, 2008, the EPA issued a Findings of Violation and Administrative Compliance Order to Bradd.  (Siekert Decl., Ex. 16 at 44-54.)  The Order found Bradd to be in violation of Section 301 of the CWA and outlined corrective actions that had to be undertaken in order to resolve the violations.  (*Id.*, Ex. 16 at 44.)  In particular, the Order required Bradd to submit a Restoration Plan for the Site to the EPA for approval.  (*Id.*, Ex. 16 at 50.)  Bradd submitted a Restoration Plan that the EPA rejected, deeming it insufficient and ineffective.  (Compl. ¶ 69; Answer ¶ 53.)

## VI.   WETLAND DELINEATIONS OF THE SITE

### A.   United States' Wetlands Determination

Timothy Smith, the Chief of the Technical Services Section in the regulatory branch of the Saint Paul District of the United States Army Corps of Engineers, prepared the March 2007 Site Investigation on behalf of the Corps.  (*See* Smith Decl. ¶ 2; Site Investigation.)  Yone Yu, an Environmental Scientist/Enforcement Officer with the EPA, and Gregory Carlson, a Life Scientist/Enforcement Officer with the EPA, co-authored the United States' Final Inspection Report dated December 5, 2011, on behalf of the EPA.

---

[6] A replacement order rather than a restoration order was issued because Bradd had already sold the Site.  (Olson Decl. ¶ 20.)

(*See* Decl. of Yone F. Yu ¶¶ 2, 7, Ex. A ("Final Report"), Mar. 29, 2013, Docket No. 35;[7] Decl. of Gregory T. Carlson ¶ 6, Mar. 29, 2013, Docket No. 38.)   Additionally, along with Smith, Benjamin Cox, an Enforcement and Compliance Specialist with the Corps prepared an opinion regarding the connection of the Site to navigable waters for purposes of establishing CWA jurisdiction.  (Cox Decl. ¶¶ 2, 5.)  Smith, Yu, Carlson, and Cox all have extensive education and training in their fields and are all specifically trained to make wetland determinations.  (Smith Decl. ¶ 3; Yu Decl. ¶ 4; Carlson Decl. ¶ 2; Cox Decl. ¶ 3.)

### 1.      Wetland Delineations

In conducting the Site Investigation, Smith and his Corps colleagues used the methodology for identifying wetlands specified in the 1987 Corps of Engineers Wetland Delineation Manual ("the 1987 Manual").  (Smith Decl. ¶ 6.)  Similarly, in completing the Final Report the EPA used the methodology of the 1987 Manual and the 2009 regional supplement to the 1987 Manual.   (Final Report 1-1.)  The 1987 Manual is used to identify and delineate wetlands for purposes of Corps regulatory programs pursuant to Section 404 of the CWA.  (Smith Decl. ¶ 12.)  Specifically, the Corps defines wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a

---

[7] Exhibit A to the Yu Declaration is the December 2011 Final Inspection Report authored by Yu and Carlson.  (Yu Decl. ¶ 7.)  This Final Report was filed on the Docket in three separate parts as attachments 1 through 3 to the Yu Declaration.  This Order will refer to the entirety of Exhibit A as the Final Report, with page numbers given as the relevant attachment number followed by the CMECF page number.  For example Final Report 1-62 refers to CMECF page 67 in part 1 of Exhibit A found at the first attachment to the Yu Declaration.

prevalence of vegetation typically adapted for life in saturated soil conditions." (*Id.* (quoting 33 C.F.R. § 328.3).)  Three parameters guide the Corps' determination of whether an area is a wetland – soils, vegetation, and hydrology. (*Id.*)  Typically, where normal circumstances are presented, all three parameters must be present before the Corps will identify an area as wetlands. (*Id.*)  "Normal circumstances" refers to the soil and hydrologic conditions normally present, and disregards whether vegetation has been removed. (*Id.*)  If vegetation has been altered or removed prior to Corps' inspection, then wetland delineators look to determine whether wetland hydrology and hydric soils are present. (*Id.*)  If hydrology and hydric soils are present, wetland status can still be found even in the absence of hydrophytic vegetation. (*Id.*)  In addition to data collected from the Site, the Corps used maps and previous surveys of the Site in making its wetland determinations, a practice provided for in the 1987 Manual. (Smith Decl. ¶ 5; *see, e.g.,* Site Investigation 1-25.)

The Site Investigation divided the Site into four main areas based on the location of potential impacts to wetlands: Road Impact Areas, Area A, Area B, and Area C. (Smith Decl. ¶ 6; Compl., Ex. A; Site Investigation at 1-19.)  Samples were then taken at set intervals along transects within those areas to assess the soil, hydrology, and vegetation.  (Site Investigation at 1-20.)   The Site Investigation noted that "normal circumstances" did not exist in many of the sampled areas, concluding that:

> In general, normal circumstances do not exist in any of the Areas (A, B, or C) at the site because both soils and hydrology were altered by mechanized land clearing, grading, filling, and excavation.  This includes wetland areas outside of the footprint of disturbance because of the potential alteration of hydrology.  More specifically, the large amount of dredged material spread across each area, the pond excavations, and the grading have likely altered

surface water flows and may have altered groundwater movement through each area.

(Site Investigation at 1-24 (footnote omitted); Smith Decl. ¶ 12.)  Due to these findings, the Site Investigation explained that "when positive wetland indicators for one or more of the three parameters have been altered or removed, application of the three-parameter approach can result in a false conclusion that the area is non-wetland."  (*Id.* at 1-26.)

The Site Investigation concluded that wetlands had been impacted in each of the Site's four areas.  (Smith Decl. ¶¶ 6, 8, 13; Site Investigation 1-33.)  Because the United States seeks to hold Defendants liable only for impacts in Area A and C, as well as several of the sampled sites within the Road Impact Area, this Order addresses the Site Investigation's findings only with respect to those areas.

In Area A, twenty-eight sample points were established.  (Site Investigation 1-21, 1-26 through 1-29.)  Soil and hydrology sampling occurred at each of the points, but due to sampling errors vegetation data was only available for seven of the points.  (Site Investigation 1-21.)  The Site Investigation concluded that twenty-one of the sample points met the criteria of a wetland, with seven points displaying all three wetland criteria.  (Site Investigation 1-26 through 1-29.)  The Site Investigation further concluded that dredged or fill materials had been discharged into wetlands at sixteen of the twenty-eight sample points.  (Smith Decl. ¶ 10; Site Investigation 1-41.)  Specifically, the Site investigation found that 4.19 acres of wetlands had been impacted by development activities at the Site, including 1.9 acres impacted due to the discharge of dredged material from excavation of the two ponds and an additional 2.29 acres of impact due to the discharge of dredged material from the sidecasting of dredged spoils, mechanized

landclearing, and grading.  (Site Investigation 1-33.)  Additional samples taken by the EPA in 2011 also found wetlands within Area A.  (Final Report 1-8 through 1-11.)

In Area C twenty-five sample points were established, and wetland criteria were found at twenty-one of them.  (Site Investigation 1-30.)  No vegetation data was available in Area C due to the development activities at the Site, but the Site Investigation noted that "the absence of vegetative data does not prohibit wetland determinations and delineations from being completed for this area."  (*Id.*)  Five additional sample points established by the EPA in Area C in September 2011 revealed all three indicators for a wetland.  (Yu Decl. ¶ 15; Final Report 1-14 through 1-20.)  Dredged and fill materials were documented at nineteen of the twenty-one sample points determined to be located in wetlands.  (Smith Decl. ¶ 10; Site Investigation 1-43.)  Specifically, the Site Investigation found that 5.33 acres of wetland were impacted in Area C due to the excavation and discharge activities at the Site, including excavation of a 1.14 acre pond and the discharge of dredged or fill materials into 4.19 acres of wetlands.  (Site Investigation 1-33.)

In later inspections of the Site, the Corps also determined that wetlands had been impacted by the development activities at, among others, Road Impact Areas 1 through 5 and 12.  (Smith Decl., Ex. C ("Jurisdictional Determination") 5-8, 5-9.)[8]

---

[8] The Corps' Jurisdictional Determination was filed as Exhibit C to the Smith Declaration.  (Smith Decl. ¶ 14.)  This Jurisdictional Determination was filed in three separate parts as attachments 5 through 7 to the Smith Declaration.  This Order will refer to the entirety of Exhibit C as the Jurisdictional Determination, with page numbers given as the relevant attachment number followed by the CMECF page number.  For example Jurisdictional Determination 6-14 refers to CMECF page 14 in part 2 of Exhibit C found at the sixth attachment to the Smith Declaration.

### 2.    Connection to Navigable Waters

With respect to whether the wetlands connected to navigable waters, as required for the Corps to exercise CWA jurisdiction, the Corps and EPA investigators found that only Areas A, C, and Road Impact Areas 1-5 and 12 had a sufficient nexus with navigable waters to establish jurisdiction.    (Smith Decl. ¶ 14; Jurisdictional Determination 5-4 through 5-9.)  Accordingly, these are the only areas addressed in the United States' brief and in this Order.

The United States' experts concluded that wetlands Areas A and Road Impact Areas 1-5 are connected to the Little Willow River via an unbroken surface connection. (Yu Decl. ¶ 9; Jurisdictional Determination at 5-4, 5-5; Final Report 1-7 through 1-12; Carlson Decl. ¶ 9.)  The water from these areas drains to the north and northwest of the Site in an abutting eastern unnamed tributary.  (Yu Decl. ¶ 9.)  Yu and Cox walked the entire length of the surface connection from the wetland areas on the Site, along the eastern tributary, to the Little Willow River.  (*Id.* ¶ 10.)  Yu and Cox observed indicators of ordinary high water mark and other stream features at four separate cross sections along the eastern tributary at roughly regular intervals.  (*Id.*)  Yu noted that there were several areas in the first 1,700 feet of the eastern tributary, north of the Waletzko Road where the channel lost its ordinary high water mark and became a wetland area.  (*Id.*) Downstream, however, Yu and Cox again observed that the stream reformed and bore the ordinary high water marks.  (*Id.*)

Area C and Road Impact Area 12 drain to the northwest of the Site.  (Yu Decl. ¶ 16.)  Corps and EPA officials observed that the wetlands found in Area C abutted a

western unnamed tributary to the Little Willow River.  (Yu Decl. ¶¶ 15-16, Jurisdictional Determination 5-6, 5-7; Final Report 1-20, 1-21; Olson Decl. ¶ 13; Poppe Decl. ¶ 23.) Cox and Yu followed the western unnamed tributary north toward the Little Willow River.  (Yu Decl. ¶ 20.)  They observed indicators of ordinary high water marks and other stream features at three cross sections.  (*Id.*)  With the exception of a large wetland complex, the tributary was continuous.  (*Id.*)  Although Yu and Cox did not have permission to cross private land to continue following the tributary, they used a combination of aerial photos and remote sensing data to confirm that the tributary continues to flow northeast for 1,800 feet to its confluence with the Little Willow River. (*Id.*)

In 2007 the Corps monitored both the eastern and western tributaries connected to wetlands on the Site to determine for how many months out of the year the tributaries contained water flow.  (Cox Decl. ¶ 7; Smith Decl. ¶ 15; Jurisdictional Determination 5-4 through 5-7, 6-2 through 7-43.)  The Corps monitored the two tributaries from April 13 through July 9.  (Jurisdictional Determination 6-2, 7-40.)  Water flow was observed in the eastern tributary from April 13 through July 3 and water flow was observed in the western tributary from April 13 through June 25.  (Jurisdictional Determination 5-5, 5-6, 6-2 through 7-33.)  The Corps also concluded that based upon study of the average ambient temperature, snowpack, and precipitation data it is "reasonable to assume that surface flows were present in the channel[s] from mid-March until April 13 when weekly monitoring began" and that "[s]urface flows would also be expected at the end of the growing season (September and October)."  (Jurisdictional Determination 5-5 through 5-

7.)  On September 7, 2011, Yu and Cox also observed flowing water in both the eastern and western tributaries.  (Final Report 1-11, 1-12, 1-20, 1-21.)

The eastern and western tributaries discharge into the Little Willow River approximately 0.69 river miles downstream from the Site.  (Jurisdictional Determination 5-2.)  The Little Willow River is a perennial stream, and flows north from where it meets the tributaries to where it meets with the Willow River, approximate 3.25 river miles from the Site.  (Yu Decl. ¶ 12; Jurisdictional Determination 5-2, 5-3.)  The Willow River is a traditionally navigable water, because it meets the criteria to be considered a navigable water of the United States pursuant to Part 33 C.F.R. § 329 and has been previously designated as such by the Corps.  (Yu Decl. ¶ 13; Jurisdictional Determination 1-3.)

### B.    Defendants' Expert Report

Defendants submitted a Technical Review prepared by Earth Science Associates, Inc. ("ESA") on behalf of Defendants' law firm – Messerli & Kramer P.A.  (Aff. of Malcolm P. Terry, Ex. A ("Technical Review") Apr. 19, 2013, Docket No. 48.)  Earth Sciences was retained by Bradd in 2008 to prepare the Restoration Plan ordered by the EPA.  (Technical Review at 1-5.)[9]

---

[9] The Technical Review was filed as Exhibit A to the Terry Declaration.  (Terry Decl. ¶ 2.)  The Technical Review was filed in five separate parts as attachments 1 through 5 to the Terry Declaration.  This Order will refer to the entirety of Exhibit A as the Technical Review, with page numbers given as the relevant attachment number followed by the CMECF page number.

The Technical Review relied primarily on previous maps of the Site and concluded that prior to the Malskochs' activity at the Site, wetland areas existed in Areas A, B, and C, close to where the ponds exist.  (*Id.* 1-8 ("[W]etland areas . . . had previously existed where ponds . . . presently exist.  The 7.5 minute topographic map indicates previous wetlands in areas A, B, and C, close to where the ponds exist.").)  Based on these maps and eight soil samples from the Site, the Technical Review concluded, however, that previous wetland areas had not existed in "most of the alleged impact areas."  (*Id.*; *see also id.* 2-9 through 2-10.)  Specifically, the Technical Review estimated that, at least with respect to a portion of Area A, only 1.3 acres of wetland were filled.  (*Id.* 5-18.)

With respect to the wetlands' connection to navigable waters, the Technical Report concluded that the alleged wetland violation areas in Area A were "adjacent" to the eastern unnamed tributary and the alleged wetland violation areas in Area C were "adjacent" to the western unnamed tributary.  (Technical Review 2-8.)  During an October 17, 2011 Site visit, Defendants' expert observed that the eastern tributary contained no flowing water and the western tributary contained a small amount of flowing water at the points where the tributaries abut the Site.  (Technical Review 2-5 through 2-7.)  The Technical Review also noted that "[b]oth unnamed streams from the Mlaskoch site would likely flow during the spring melt (late April) and flow until the mid-summer when it typically becomes dryer."  (*Id.* 2-8.)

On June 28, 2010, the United States filed a complaint against Defendants based on the activities that occurred at the Site.  Count I alleges violations of Sections 301(a) and

404 of the CWA, 33 U.S.C. §§ 1311(a) and 1344.  (Compl. ¶¶ 51-65.)  The Complaint

seeks injunctive relief, civil penalties, and an order requiring Defendants to complete

restoration at the Site.  (Compl. at 16-17.)  The United States now moves for summary

judgment with respect to Defendants' liability for the violations alleged in Count I.

## ANALYSIS

### I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material

fact and the moving party can demonstrate that it is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit,

and a dispute is genuine if the evidence is such that it could lead a reasonable jury to

return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  A court considering a motion for summary judgment must view the facts in the

light most favorable to the non-moving party and give that party the benefit of all

reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986).[10]

### II.   STATUTE OF LIMITATIONS

Defendants first argue that the instant action is barred by the statute of limitations,

and therefore the United States' motion for summary judgment must be denied.  The

---

[10] Defendants cite an old formulation of summary judgment suggesting that "'[s]ummary judgment is an extreme remedy.'"  (Def.'s Mem. in Opp'n to Mot. for Summ. J. at 11, Apr. 19, 2013, Docket No. 47 (quoting *Fin. Timing Publ'ns, Inc. v. Compugraphic Corp.*, 893 F.2d 936, 944 (8th Cir. 1990).)  This standard for summary judgment has been rejected.  *See, e.g.*, *Chicago Ins. Co. v. Farm Bureau Mut. Ins. Co. of Ark., Inc.*, 929 F.2d 372, 374 n.4 (8th Cir. 1991).

CWA does not contain a statute of limitations.  In the absence of an express limitations period in the Act itself, numerous courts have applied the default limitations provision found in 28 U.S.C. § 2462 to government enforcement actions for civil fines or penalties under the CWA.  *See, e.g.*, *United States v. Telluride Co.*, 146 F.3d 1241, 1244 (10th Cir. 1998); *United States v. Banks*, 115 F.3d 916, 918 (11th Cir. 1997); *United States v. Rutherford Oil Corp.*, 756 F. Supp. 2d 782, 787 (S.D. Tex. 2010).  Section 2462 states:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . .

28 U.S.C. § 2462.  Generally a claim accrues under § 2462 "'when the plaintiff has a complete and present cause of action.'"  *Gabelli v. SEC*, 133 S. Ct. 1216, 1220 (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)); *see also Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1014 (8th Cir. 2010) (applying § 2462 to a claim under the Clean Air Act and explaining that "[a] claim first accrues as soon as the right to institute and maintain a suit arises" (internal quotation marks omitted)).  Therefore, "the time for the United States to sue under § 2462 begins with the violation."  *United States v. Midwest Generation, LLC*, 720 F.3d 644, 646 (7th Cir. 2013) (citing *Gabelli*, 133 S. Ct. 1216).  The United States commenced this lawsuit on June 28, 2010, with the filing of its complaint.  Therefore, in order for the action to be timely, Defendants' violations must have occurred after June 28, 2005.

The Court finds that a material issue of fact remains regarding the extent of the development activities that took place at the Site after June 28, 2005.[11]  Defendants stated in their response to the EPA request for information that "[s]ome excavating/road work was performed from the months of early summer 2005 until Late 2005," and in his deposition Bradd testified that "excavating/road work" referred to both the "roadwork and the pond work."   Bradd also testified, based on his recollection of his communications with Robin Poppe, that all the work at the Site was completed in April and May 2005.  But he later admitted that it was possible the work was instead completed in August 2005, explaining "[i]t took several months of digging out there.  I don't know. I don't know.  Like I say, we started that summer and I'm not sure when we finished.  It's hard to say."  (Bradd Dep. 241:2-6.)  Based on this collection of facts and Robin Poppe's testimony that she did not provide a letter to Bradd in March of 2005 as claimed, a reasonable factfinder could conclude that at least some of the development activities at the Site related to both the ponds and the Road occurred after June 28, 2005.

The United States argues, however, that even if a material issue of fact remains regarding the timing of the developments at the Site, the Court should still grant its motion for summary judgment on **liability** because at least some of the United States' remedies for the alleged violations are not subject to the statute of limitations.

---

[11] It is undisputed that work on the Road occurred within the limitations period.  The affidavits submitted by the Mlaskochs in opposition to this motion indicate that work on the Road began in early October 2005.  Because a material issue of fact potentially remains regarding whether the areas impacted by the Road were wetlands within the jurisdiction of the CWA, the Court declines to rely on the undisputed timing of the Road work to find that summary judgment on liability is appropriate due to the fact that at least some of the development activity occurred within the limitations period.

Specifically, the United States argues that the statute of limitations does not bar the present action in its entirety because § 2642 does not apply to the injunctive and remedial relief sought by the United States in its complaint.

The language of § 2642 states that it applies only to proceedings "for the enforcement of any civil fine, penalty, or forfeiture."  Courts interpreting the scope of § 2642 have determined that by its terms § 2642 "does not bar equitable remedies."  *Otter Tail Power Co.*, 615 F.3d at 1018; *see also Telluride Co.*, 146 F.3d at 1245; *Banks*, 115 F.3d at 919.  In determining whether a remedy is a "civil fine" or "penalty" for purposes of § 2462, courts focus on "whether the sanction seeks compensation unrelated to, or in excess, of the damages caused by the defendant," and have concluded that restoration orders and other injunctions in CWA cases are not subject to a five year statute of limitations.  *Telluride Co.*, 146 F.3d at 1246-47 ("[T]he restorative injunction in this case is not a penalty because it seeks to restore only the wetlands damaged by Telco's acts to the status quo or to create new wetlands for those that cannot be restored.  The injunction does not seek compensation unrelated to or in excess of the damages caused by Telco's acts.").

Although § 2462 does not, as a general matter, restrict the time in which the United States may seek equitable relief, here, the United States seeks both civil fines or penalties in addition to equitable relief.  Because the United States seeks both legal and equitable relief, Defendants argue that the equitable relief is barred under the concurrent remedy doctrine.  The doctrine "provides that where a party's legal remedies are time-barred, that party's concurrent equitable claims generally are barred as well."  *Otter Tail*

- 26 -

*Power Co.*, 615 F.3d at 1018 (internal quotation marks omitted). The Eighth Circuit has held that the concurrent remedy doctrine bars citizen suits for equitable relief under the Clean Air Act if the statute of limitations for civil penalties has run. *Id.* at 1018-19. However, the Eighth Circuit has not addressed the question of whether the concurrent rule applies to bar equitable relief in **government** suits. Other courts to confront this question have found that government suits raise different interests with respect to the statute of limitations than citizen suits, and have overwhelmingly concluded that the concurrent remedy doctrine does not bar suits for injunctive relief brought by the government under the CWA where the five year limitation period of § 2462 has run. *See Telluride*, 146 F.2d at 1248-49; *Banks*, 115 F.3d at 919; *see also United States v. U.S. Steel Corp.*, Civ. No. 12-304, 2013 WL 4495665, at *10 (N.D. Ind. Aug. 21, 2013) (collecting cases holding "that the concurrent remedy rule does not apply to a suit by the United States in its governmental capacity" (emphases and internal quotation marks omitted)).

In distinguishing government suits from citizen suits brought under environmental statutes, courts have cited "the well-established rule that 'an action on behalf of the United States in its governmental capacity . . . is subject to no time limitation, in the absence of congressional enactment clearly imposing it,'" *Banks*, 115 F.3d at 919 (quoting *E.I. Du Pont De Nemours & Co. v. Davis*, 246 U.S. 456, 462 (1924)), as well as the canon of statutory construction that, "'[s]tatutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government,'" *United States v. Findett Corp.*, 220 F.3d 842, 848 (8th Cir. 2000) (quoting

- 27 -

*Badaracco v. Comm'r*, 464 U.S. 386, 391 (1984)).   Relying on these principles, *Banks* concluded that "the concurrent remedy rule cannot properly be invoked against the government when it seeks equitable relief in its official enforcement capacity.   Because Congress did not expressly indicate otherwise in the statutory language of section 2462, its provisions apply only to civil penalties."   115 F.3d at 919; *see also Telluride*, 146 F.3d at 1248-49; *cf. Caldwell v. Gurley Ref. Co.*, 755 F.2d 645, 651 (8th Cir. 1985) (finding in the context of a different statutory scheme that the limitations period in Section 2462 applied only for "enforcement of a civil penalty" not to the government's efforts to recover clean-up costs).

Because nothing in the Clean Water Act itself or § 2642 precludes the United States from seeking injunctive relief beyond the five-year statute of limitations period, the Court concludes that the United States' claims for such relief are not barred, even if § 2642 would preclude it from recovering damages.   In other words, even if a factfinder were to later determine that none of the alleged conduct took place prior to June 28, 2005, the Court would still be allowed to order injunctive or remedial relief.   Resolving the factual disputes regarding when work was completed at the Site and the corresponding extent of the United States' remedies is therefore a question that goes to remedies rather than liability.   Consequently, the Court finds that Defendants' statute of limitations argument does not prevent the Court from granting the United States' present motion for summary judgment as the motion seeks summary judgment only with regard to liability.[12]

---

[12] For reasons of efficiency, the Court also declines to resolve, at this stage, the United States' legal arguments – based upon the continuing violations doctrine, equitable estoppel, and

(Footnote continued on next page.)

### III.   UNITED STATES' PRIMA FACIE CASE

Section 301 of the CWA prohibits any person from discharging a pollutant from a point source, into navigable waters, without a permit.   *See* 33 U.S.C. §§ 1311(a), 1362(12) (defining "discharge of any pollutant" broadly as "any addition of any pollutant to navigable waters from any point source"), 1344(a) (providing for the issuance of permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites").   Therefore, to establish a prima facie case for violation of the CWA, the United States must show that Defendants are (1) persons who (2) discharged (3) a pollutant (4) into navigable waters (5) from a point source (6) without authorization under Section 404 of the CWA.   *See* 33 U.S.C. § 1311(a); *Comm. to Save Mokelumne River v. E. Bay Mun. Utility Dist.*, 13 F.3d 305, 308 (9th Cir. 1993).   "The United States bears the burden of making a prima facie case that [Defendants] violated the CWA." *United States v. Huseby*, 862 F. Supp. 2d 951, 959 (D. Minn. 2012).

The parties do not dispute that the fill and dredged material allegedly discharged by Defendants constitutes a pollutant within the meaning of the CWA.   *See* 33 U.S.C. § 1362(6) (defining "pollutant" to include "dredged spoil, solid waste . . . rock, [and]

_____

(Footnote continued.)

tolling – that the statute of limitations should not bar the recovery of damages in this case.  At the remedies stage of these proceedings, a factfinder could determine that all of the alleged conduct occurred after June 28, 2005, and was therefore within the statute of limitations period provided by § 2642.   In that instance, the Court would never be required to determine whether a continuing violations, equitable estoppel, or tolling analysis would apply to extend the statute of limitations.   In the event that a factfinder determines that some of the alleged development activities occurred before June 28, 2005, the Court will consider the United States' arguments for extending the statute of limitations at that time.

sand").  Nor do the parties dispute that any such discharge was from a point source and that Defendants lacked a permit under Section 404 of the CWA.  Accordingly, the Court will examine only (1) whether Defendants are "persons" within the meaning of the CWA; (2) whether any of the alleged discharge was into navigable waters; and (3) whether Defendants discharged any fill or dredged material.

### A.    Person

The CWA defines "person" to include both individuals and corporations.   33 U.S.C. § 1362(5).  The CWA imposes liability only on persons that either "performed the work" or "had responsibility for or control over the performance of the work."  *Stillwater of Crown Point Homeowner's Ass'n, Inc. v. Kovich*, 820 F. Supp. 2d 859, 887 (N.D. Ind. 2011); *see also Assateague Coastkeeper v. Alan & Kristin Hudson Farm*, 727 F. Supp. 2d 433, 442 (D. Md. 2010).

Defendants concede that both Bradd and Danielle are persons within the meaning of the CWA, as the undisputed facts show that the Mlaskochs either performed the work on the Site or controlled the performance of the work.  But Defendants dispute that MEI can be held liable for actions taken at the Site.  As support for its position that MEI either performed the work at the Site or had responsibility for or control over that work, the United States relies upon Olson's declaration, which indicates that in November 2005 Olson spoke with Danielle and Danielle told her that "she was the person responsible for putting in the road on the subject property and that Mlaskoch Excavating, Inc. was performing the work."  (Olson Decl. ¶ 11.)  But Danielle denies making that statement, and instead contends that the work was actually being performed under the Westside

Properties' business name.  Additionally, Danielle testified that payments for work on the Property were not made from MEI and both she and Bradd testified at their depositions that MEI did not have anything to do with the work performed on the Site.  This testimony is sufficient to create a material issue of fact with respect to whether MEI is a person within the meaning of the CWA and can therefore be held liable for the allegations in Count I.  Accordingly, the Court will deny the United States' motion for summary judgment on Count I with respect to MEI.

### B.    Navigable Waters

The parties dispute whether any discharge of fill and dredged materials by the Mlaskochs was a discharge into "navigable waters" as defined by the CWA.  The CWA defines "navigable waters" as the "waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  Under the Corps' regulations, navigable waters include waters that are navigable-in-fact and wetlands adjacent to navigable in fact waters.  33 C.F.R. § 328.3(a)(1), (7).  The Eighth Circuit has held that the Corps has jurisdiction over wetlands that (1) have a "continuous surface connection" to navigable in fact waters or (2) possess "a significant nexus to waters that are or were navigable in fact or that could reasonably be so made."  *United States v. Bailey*, 571 F.3d 791, 797-99 (8th Cir. 2009) (quoting *Rapanos v. United States*, 547 U.S. 715, 742, 759 (2006)).  A wetland has the "requisite" significant nexus if it "either alone or in combination with similarly situated lands in the region, significantly affect[s] the chemical, physical, and biological integrity of the covered waters more readily understood as 'navigable.'"  *Id.* at 798 (quoting *Rapanos*, 547 U.S. at 780).

### 1.   Existence of Wetlands

Defendants first challenge the existence of wetlands on the Site.  In particular, Defendants argue that the Technical Review creates an issue of material fact as to whether Defendants discharged dredged and/or fill materials into wetlands.[13]  Because remedies are not at issue in this motion, any disputes between the expert reports as to **how much** wetland area was impacted on the Site are irrelevant.  The only way the

---

[13] As an initial matter, the United States objects to the admissibility of the Technical Review because it was unsworn and unverified.  (*See* Reply at 8-9, May 3, 2013, Docket No. 53.)  Here, the Technical Review was attached to the affidavit of one of the Defendants' attorneys, and was not accompanied by an affidavit of Kenneth Meek, the author of the Technical Review.  *See Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003) (finding that an expert report "introduced into the record without any supporting affidavit verifying its authenticity" is "inadmissible and cannot be considered for purposes of summary judgment"); *see also DG&G, Inc. v. Flexsol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 825-26 (8th Cir. 2009) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence . . . ." (internal quotation marks omitted)).  The Court need not decide whether the attorney's affidavit was sufficient authentication of the Technical Review because after the United States filed its reply brief, Kenneth Meek submitted an affidavit providing foundation for the Technical Review and attaching "a true and correct copy of the Technical Review" to the affidavit.  (Aff. of Kenneth E. Meek ¶¶ 1, 13, 15, Ex. A, Sept. 5, 2013, Docket No. 56.)  The Court "has broad discretion in permitting supplementation of the summary judgment record" and "has discretion whether to accept or reject untimely filed materials."  *See DG&G, Inc.*, 576 F.3d at 826 (internal quotation marks omitted).  Where an expert report has been submitted in support of summary judgment without an accompanying affidavit, many courts have permitted subsequently filed affidavits to cure those previously unsworn materials.  *See id.* (finding that the district court did not abuse its discretion in permitting a party to supplement the summary judgment record with an affidavit that cured a previously unsworn expert report); *Skrovig v. BNSF Ry. Co.*, 855 F. Supp. 2d 933, 936 (D.S.D. 2012) (considering expert witness reports initially filed without affidavits when plaintiffs later submitted sworn affidavits from the two expert witnesses with the original reports attached); *Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006) ("[S]ubsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment.").  The Court will accept the late-filed affidavit of Kenneth Meek as curing any previous deficiencies in the submission of the Technical Review, and therefore considers the Technical Review as part of the summary judgment record.

Technical Review could create a genuine issue of material fact with respect to the present motion, which is limited to liability, is if it demonstrates that **none** of the impacted areas were wetlands.  The Court concludes that no reasonable jury could conclude that the Technical Review demonstrates that none of the impacted areas were wetlands.

The United States' expert reports regarding the Site are comprehensive and thorough.  The Corps took numerous samples in each of the Areas designated on the Site and analyzed them for the three wetland markers.  As described above, the expert reports followed the definition of wetlands found within the CWA regulations, *see* 33 C.F.R. § 328.3(b), and make detailed conclusions about which areas on the Site constituted wetlands and which of those areas had been impacted by the discharge of dredged or fill materials.  Defendants have identified no part of the Technical Review that either disputes the entirety of the United States' expert reports or concludes that no wetlands were impacted at the Site.  Instead, Defendants argue that the Technical Review creates a genuine issue of fact because it calls into doubt **some** of the wetland delineations made by the government's experts.  (*See, e.g.*, Def.'s Mem. in Opp'n to Mot. for Summ. J at 9, Apr. 19, 2013, Docket No. 47 ("The Technical Review submitted by Defendants found that **the majority** of the Site did not contain the three requisite indicators of wetlands . . . [and] indicated that areas of the Site with potentially hydric (wetland soils) 'are shown **smaller** than the alleged violation area.'"   (quoting Technical Review) (emphases added)).)  But the Technical Review explicitly found that wetland areas had previously existed in Areas A, B, and C close to where the ponds exist and also concluded that at most 1.3 acres of wetlands had been affected.  (Technical Review 1-8.)   These are

precisely the areas in which it is undisputed, according to Bradd's own deposition testimony, that the Mlaskochs spread materials they had dredged from the ponds. Therefore, no material issue of fact remains with respect to whether the Mlaskochs discharged dredged or fill materials into wetlands, which is the only issue relevant to liability. Even if some of the United States' conclusions about the presence of a wetland are wrong – there remain at least some areas for which it is undisputed that there were wetlands affected by the Site's activities. Issues of the experts' methodologies, precise determinations of which areas are wetlands, and into which areas dredged or fill materials were discharged, go to the extent of the United States' remedy, not the Mlaskochs' liability. Because the Technical Review does not create a genuine issue of material fact with respect to liability, the Court concludes it is undisputed that at least some dredged or fill material was discharged into some wetlands during the activities at the Site.

### 2.    Requisite Nexus

In addition to establishing the presence of wetlands, the United States must demonstrate that those wetlands are within the Corps' CWA jurisdiction. The CWA prohibits the discharge of any pollutant from any point source into "navigable waters." *See* 33 U.S.C. §§ 1311(a), 1344. The CWA defines "navigable waters" as the "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The regulations promulgated by the Corps' define navigable waters as waters that are navigable in fact or "traditionally navigable" waters and wetlands adjacent to such waters. 33 C.F.R. § 328.3(a)(1), (7). The Eighth Circuit has held that the Corps has jurisdiction over wetlands that (1) have a "continuous surface connection" to navigable-in-fact waters or

(2) possess "a significant nexus to waters that are or were navigable in fact or that could reasonably be so made." *Bailey*, 571 F.3d at 798-99 (quoting *Rapanos*, 547 U.S. at 759). Here, the United States relies exclusively upon the first test for identifying wetlands within the Corps' jurisdiction which requires two findings:

> [F]irst, that the adjacent channel contains a "water of the United States" (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins.

*Rapanos*, 547 U.S. at 742 (alteration omitted).

Defendants argue that the United States has failed to demonstrate that the wetlands in question had a continuous surface connection with a water of the United States. Defendants argue that there is a material issue of fact regarding whether the eastern and western unnamed tributaries flow for three months out of the year, and can therefore be classified as waters of the United States.

Under the continuous surface connection test, the wetland in question must have a continuous surface connection with a water of the United States. Waters of the United States "include only relatively permanent, standing or flowing bodies of water" such as "streams, oceans, rivers, lakes, and bodies of water forming geographic features." *Rapanos*, 547 U.S. at 732-33 (internal quotation marks omitted). The Supreme Court explained that:

> All of these terms connote continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows. Even the least substantial of the definition's terms, namely, streams, connotes a continuous flow of water in a permanent channel . . . . None of these terms encompasses transitory puddles or ephemeral flows of water.

*Id.* at 733 (internal quotation marks and footnote omitted).  The Court clarified, however, that in defining waters of the United States as "relatively permanent" it did "not necessarily exclude **seasonal** rivers, which contain continuous flow during some months of the year but no flow during dry months . . . . Common sense and common usage distinguish between a wash and a seasonal river." *Id.* 732 n.5 (emphasis in original).

The Corps has interpreted the Supreme Court's explanation of seasonal rivers to include those bodies of water which have "continuous flow at least seasonally (e.g., typically 3 months)" and exercises jurisdiction over wetlands which abut such waters. (Site Investigation 2-183.)   Courts have similarly found that seasonal waterways containing water flow for only a few months out of the year are sufficient to meet the definition of waters of the United States under *Rapanos*.  *See, e.g.*, *United States v. Moses*, 496 F.3d 984, 989-91 (9th Cir. 2007) (finding an intermittent tributary to be a water of the United States, even though the channel held water continuously for only two months out of the year); *United States v. Vierstra*, 803 F. Supp. 2d 1166, 1170 (D. Idaho 2011) (finding that a canal was "relatively permanent" where it contained water flow on a seasonal basis for six to eight months out of the year); *Sequoia Forestkeeper v. U.S. Forest Serv.*, Civ. No. 09-392, 2011 WL 902120, at *5 (E.D. Cal. Mar. 15, 2011) (finding a creek to be "relatively permanent" where the "record makes clear that Fay Creek is a stream that flows throughout certain seasons of the year, even in its lower stretches, drying up in the summer months").

Defendants do not dispute that the wetlands on the Site abut the eastern and western tributaries, nor do Defendants dispute that the eastern and western tributaries

flow into the Little Willow River which ultimately flows into the Willow River. Defendants argue, however, that the eastern and western tributaries cannot meet the standard for "relatively permanent" seasonal streams because the United States' experts did not observe water flow in the tributaries for at least three months.  Water flow was observed and documented in the eastern tributary between April 13 and July 3, and in the western tributary between April 13 and June 25.[14]  But this was not the sole evidence of water flow presented by the United States.  In addition to these direct observations, the United States' and Defendants' experts agreed that it was reasonable to assume that the streams would also flow during the spring thaw, which, based on ambient temperature, would likely have occurred in mid-March of 2007.[15]  Additionally, water was observed in both of the tributaries in varying amounts during the EPA's September 2011 visit as well

---

[14] Defendants also assert that a material issue of fact remains because on some occasions during the monitoring period, the Corps' notes indicate that the water level was below the detection limit of the flow meter.  (*See, e.g.*, Jurisdictional Determination 6-27.)  As explained in the Corps' monitoring notes, a flow below the detection limit of the flow meter does not mean that the stream channel did not contain water or that the water was stagnant.  Rather, it simply means that at certain points the water flow was slower than could be detected by the meter.  On each of the occasions where the water level was below the detection limit, pictures of the tributaries and notes documenting the water flow exist.  (*See, e.g.*, *id.* 6-32, 6-33.)  Therefore, the lack of a flow meter reading does not present a material issue as to whether water was flowing in the tributaries during the time period of the Corps' 2007 monitoring.

[15] Defendants' expert agreed that the tributaries would flow continuously during the spring melt, but noted that the spring melt would occur in late April.  This conclusion is contradicted by the United States' undisputed evidence that water was already flowing in the tributaries in mid-April and is unsupported by any evidence regarding snowpack or ambient temperature.  Because, Defendants' conclusion is not supported by the only undisputed evidence in the record regarding when water appeared in the tributaries and when the spring thaw occurred in 2007, it does not create a material issue of fact.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the [expert] opinion unreasonable, it cannot support a jury's verdict.").

as in the western tributary during the October 2011 visit of Defendants' expert. Therefore, the undisputed evidence indicates that the tributaries enjoy seasonal flow for at least three months, which is sufficient to meet the standard for relatively permanent set out in *Rapanos*. *See Moses*, 496 F.3d at 989-991. Additionally, Defendants have not disputed the evidence presented by the United States that high water marks were observed at regular intervals on the eastern and western tributaries and that both tributaries showed other stream features, such as beds and banks. This evidence supports the conclusion that these tributaries are relatively permanent waters of the United States. *See Vierstra*, 803 F. Supp. 2d at 1170 (finding that evidence of an ordinary high water mark and a defined bed and bank supported a finding that a body of water was "relatively permanent").[16] Therefore, the Court concludes that the eastern and western tributaries are relatively permanent bodies of water and therefore fall within the CWA's definition of navigable waters. Because the affected wetlands abutted these tributaries, jurisdiction under the CWA is proper.

---

[16] Defendants also argue at length that the evidence is disputed regarding whether there is a continuous surface connection between the affected wetlands and the Little Willow River. But as explained above, the United States need not demonstrate a continuous connection between the affected wetlands and the Little Willow River because the unnamed tributaries themselves are relatively permanent bodies of water connected to traditional interstate navigable waters. Accordingly, any disputes about whether the affected wetlands maintained a continuous surface connection with the Little Willow River are irrelevant for purposes of this motion. All the United States must establish is that the eastern and western tributaries were "connected" to a traditional navigable water, such as the Willow River. *See Rapanos*, 547 U.S. at 742. Defendants do not dispute that the eastern and western tributaries discharge into the Little Willow River, and the Little Willow River meets with the Willow River.

C.      **Discharge of Dredged or Fill Material**

Defendants argue that genuine issues of material fact remain regarding whether any unauthorized discharges of dredged material occurred at the Site.   Specifically, Defendants argue that they were not required to obtain a permit from the Corps for the work that occurred at the Site because the CWA does not require authorization "for incidental additions and fallback of dredged material that do not have the effect of destroying or degrading waters of the United States."  (Defs.' Mem. in Opp'n to Mot. for Summ. J. at 29 (footnote omitted).)

The CWA prohibits the discharge of "pollutants," including "dredged spoil, solid waste . . . rock, [and] sand," 33 U.S.C. §§ 1362(6), if that discharge fails to comply with the applicable permit program, 33 U.S.C. § 1311(a).  Because this case involves dredged and fill materials, the relevant permit program is administered by the Corps, which has exclusive authority under the Act to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites," 33 U.S.C. § 1344(a); *see Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 273-74 (2009). The Corps excludes "[i]ncidental fallback" from its definition of "discharge of dredged or fill materials" for which permits are required.  *See* 33 C.F.R. § 323.2(d)(2)(iii).  Courts have interpreted the incidental fallback exception narrowly as encompassing "the situation in which material is removed from the waters of the United States and a small portion of it happens to fall back."  *Nat'l Mining Ass'n v. U.S. Army Corps. of Eng'rs*, 145 F.3d 1399, 1404 (D.C. Cir. 1998); *United States v. Sartori*, 62 F. Supp. 2d 1362, 1365 (S.D. Fla. 1999) (defining incidental fallback as "the minor displacement of soil

caused by landclearing operations, also known 'bucket drippings' that fall from equipment as earth is excavated.").

Here, the undisputed facts show that the Mlaskochs excavated ponds and discharged the resulting dredged material alongside the ponds and surrounding areas. These actions are far more substantial than the "bucket drippings" described by courts in interpreting the Corps' regulations.  Rather, the development actions here involved digging quantities of dirt and moving that dirt to another location in order to create a pond.  Indeed, if the only discharges in this case were incidental fallback, as claimed by Defendants, it is difficult to imagine how the ponds could have been created or expanded, as all of the dirt removed from the area would have needed to fall from the equipment back into the pond as the dirt was being excavated.  Accordingly, the Court finds that the incidental fallback exception is not applicable to the development activities at the Site that form the basis of the Mlaskochs' liability.[17]

Finally, Defendants argue that permits are not required for the discharge of dredged material that do not have the effect of destroying or degrading waters of the United States, and contend that their development activities actually improved the Site. For this proposition Defendants appear to rely on a portion of the Corps' regulations which provides that:

> Any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the United States . . . however,

---

[17] Although some incidental fallback may have occurred during the course of the development at the Site, the extent of that fallback is a question for the remedies phase of this litigation and does not affect the Court's determination of liability.

> this exception does not apply to any person preparing to undertake
> mechanized landclearing, ditching, channelization and other excavation
> activity in a water of the United States, which would result in a redeposit of
> dredged material, unless the person demonstrates to the satisfaction of the
> Corps, or EPA as appropriate, prior to commencing the activity involving
> the discharge, that the activity would not have the effect of destroying or
> degrading any area of waters of the United States . . . .

33 C.F.R. § 323.2(d)(3).  This section is not applicable to the Mlaskochs' conduct, however, because the undisputed facts show that they engaged in mechanized landclearing, ditching and other excavation activity in a water of the United States. Accordingly, they were required to obtain permission from the Corps prior to commencing the activity and prove that the activity would not have the effect of destroying or degrading that area.  The Defendants seem to be arguing for an exemption from CWA liability generally for "good" discharges.  But such an exception would thwart the entire statutory scheme.  The purpose of obtaining a permit is to allow the Corps the opportunity to assess the site in question to determine what actions are permissible and the effect those actions will have on the wetlands.  Therefore, the Court finds that the activities at the Site were not exempted from the permitting requirements of the Corps.  Accordingly, the Court finds that no material issues of fact remain regarding the United States' prima facie case for liability against the Mlaskochs, and will grant the motion with respect to those defendants.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the United States of America's Motion for Partial Summary Judgment [Docket No. 32] is **GRANTED in part** and **DENIED in part**.  The motion is

**GRANTED** with respect to Defendants Bradd Lewis-James Mlaskoch and Danielle

Johnson Mlaskoch and **DENIED** with respect to Defendant Mlaskoch Excavating, Inc.


DATED: March 31, 2014                    _____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                    United States District Judge